[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 3 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 4 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 5 
OPINION
On February 27, 2004, Adelelmo Cabral's pickup truck collided with a tractor-trailer (big rig) driven by Hen Horn, an *Page 6 
employee of defendant and appellant, Ralphs Grocery Company (Ralphs), [1] while it was stopped on the side of the freeway. As a result of the collision, Adelelmo Cabral (Decedent) died. On August 26, 2005, Decedent's wife, plaintiff and respondent Maria Cabral (Plaintiff)[2] sued Ralphs and Horn for wrongful death, contending Horn's negligence in stopping in an "Emergency Parking Only" area for a nonemergency caused Decedent's death. On September 29, 2005, Ralphs cross-complained for property damage to the big rig. The case went to trial on June 20, 2007, and the jury returned a verdict for Plaintiff on the complaint and for Ralphs on its cross-complaint.
Ralphs appeals, contending that (1) as a matter of law, Horn owed no duty to Decedent to avoid stopping in the emergency parking area; (2) Horn's alleged negligence did not proximately cause the accident; and (3) the trial court erred in admitting the testimony of Plaintiffs expert on causation, and thus, the evidence is insufficient to support the verdict. We agree with Ralphs and reverse the judgment.
 I. PROCEDURAL BACKGROUND AND FACTS
A. Pretrial Motions
The trial court granted motions by Ralphs to exclude (1) an accident report prepared by the California Highway Patrol (CHP), except for photographs, physical measurements and a diagram of the accident scene, and (2) any reference to the excluded portions of the report, including any opinions regarding the accident. Ralphs's motions were based on the grounds that, among other things, the accident report was inadmissible under Vehicle Code section 20013, the report was inadmissible hearsay, and the opinions in the report were inadmissible lay opinions. At trial, a single page from the accident report containing physical measurements and a diagram of the accident scene was admitted.
The trial court denied the request of Ralphs to exclude testimony by Plaintiffs accident reconstruction expert, Robert Anderson, on the grounds that his opinions were speculative, lacked foundation, and were unduly prejudicial, confusing, and misleading.
B. Motion for Nonsuit
Following Plaintiffs opening statement, Ralphs moved for nonsuit under Code of Civil Procedure section 581c on the grounds that Plaintiff failed to *Page 7 
present evidence to prove defendants Ralphs and Horn owed any duty to Decedent or to Plaintiff, and that defendants' negligence, if any, was the cause of Decedent's death. Ralphs emphasized the cases of Arthur v. Santa Monica DairyCo. (1960) 183 Cal.App.2d 483, 487 through 488 [6 Cal.Rptr. 808], Bentley v. Chapman (1952)113 Cal.App.2d 1 [247 P.2d 575], and Victor v. Hedges
(1999) 77 Cal.App.4th 229, 238 [91 Cal.Rptr.2d 466]. The trial court denied the motion, and the case proceeded to trial.
C. Trial Testimony
On February 27, 2004, around 9:00 p.m., Decedent was driving an F-150 pickup truck (pickup) eastbound in the number three lane (of four lanes) on Interstate 10 (I-10) in San Bernardino County. Juan Perez testified that he was driving a big rig behind Decedent for some distance. He estimated Decedent's speed to be around "70, 80," miles per hour.[3] Perez opined that Decedent appeared to be intoxicated or falling asleep because his pickup was swerving left and right within the number three lane. Perez saw the pickup suddenly turn right, cutting in front of another big rig truck in the number four lane, as if attempting to exit the freeway. The pickup crossed the number four lane and the paved shoulder of the freeway and then hit the back of Ralphs's big rig, which was stopped[4]
in the dirt area approximately 16 feet from the number four lane.[5] Perez did not see brake lights activated on the pickup, nor was there any indication that Decedent tried to reduce speed or avoid hitting the big rig. There was an "Emergency Parking Only" sign (R45 sign) posted in the area (about 100 feet away) where the big rig had stopped.[6] As a result of the collision, Decedent suffered massive injuries and died at the scene.
Officer Michael Migliacci, the primary investigating officer for the collision, testified that the CHP's investigation of the collision revealed the same facts as observed by Perez. The evidence further revealed that the road surface was dry and there were no unusual conditions that would have caused Decedent to go off the road. A CHP inspection disclosed no mechanical defects that would have hindered the normal operation of Decedent's pickup. The CHP's investigation concluded that Decedent's unsafe turn from the *Page 8 
number three lane, a violation of Vehicle Code section 22107, was the sole cause of the accident. Because the cause of Decedent's death was clear, no autopsy was performed. A toxicology report showed no evidence of intoxication.
Plaintiff's human factors expert, Dr. Mark Sanders, opined that Decedent was fighting drowsiness and finally fell asleep, which caused him to leave the number three lane. The human factors expert for Ralphs, Dr. Antony Stein, opined that an undiagnosed medical condition caused Decedent, who was five feet 11 inches tall and weighed 350 pounds, to leave the freeway.
Plaintiff's expert, Anderson, testified that when Decedent hit the big rig, he was awake and alert, his pickup was in a left turn, and he would have returned safely to the freeway had the big rig not been in his path. Anderson further opined that Decedent was going no faster than 60 miles per hour (plus or minus 10 miles per hour) and that he was braking when he hit the big rig. Anderson relied on the factual diagram and a photograph taken by the CHP. Over the objection of Ralphs, and contrary to the motion in limine ruling, the trial court permitted Anderson to testify that two marks recorded on the factual diagram were labeled elsewhere in the CHP report as tire marks from Decedent's pickup. Officer Migliacci was the only witness who testified regarding preparation of the CHP report. He did not take the measurements or the photographs. He had no basis to believe the marks came from Decedent's vehicle other than the fact that the officer who had taken the measurements had labeled the marks that way. No one had compared the tread marks with the pickup's tires or found any other physical evidence indicating that the marks were from the pickup.
In contrast, the accident reconstruction expert for Ralphs, Fred Cady, testified the marks could not have been made by Decedent's pickup because (1) the marks did not align with how the pickup contacted the big rig, (2) eyewitnesses reported there was no indication that Decedent applied his brakes or reacted in any way, and (3) the pickup had antilock brakes, which would not have left a braking mark. Using eyewitness testimony and physical evidence, Cady performed a time-distance study and concluded that Decedent would not have had time to begin turning left, as Anderson claimed, before hitting the big rig.
D. Ralphs's Motion for Nonsuit
At the close of Plaintiff's evidence, Ralphs again moved for a nonsuit, incorporating its prior written motion, on the grounds that Horn owed no duty to Decedent or Plaintiff, and Horn's negligence, if any, did not proximately cause the collision. In response, Plaintiff argued that, regardless of the R45 *Page 9 
sign, the presence of Ralphs's big rig "creat[ed] a roadside obstacle." Specifically, Plaintiffs counsel argued, "There is no superseding intervening cause because when you place that roadside obstacle where it is, sign or no sign, it creates the risk of death." The court denied the motion. Ralphs sought clarification and the following exchange occurred:
"[COUNSEL FOR RALPHS]: Your Honor, may I just inquire? . . . [I]f I could go back just for a moment to the motion for judgment nonsuit. Is the court finding that [Decedent] is within a protected class?
"THE COURT: I think he is. And I think that's based on one of the experts that was talking about the danger. He talked about the danger of the deceleration and acceleration, and that did not get included at all. But one of the experts . . . testified as to the requirement that people don't park there for reasons that — of avoiding the very sort of thing that happened here. This freeway is used there and parking spot is there because of some shade and trucks pull off there and they shouldn't. And the CHP has decided that they shouldn't. And that's the attraction is the shade [sic]."
E. Jury's Verdict
The jury returned a verdict for Plaintiff on the complaint and for Ralphs on its cross-complaint. On the special verdict form, the jury found both Ralphs (through Horn) and Decedent were negligent, that each one's negligence was a substantial factor in causing Plaintiffs harm, and that Decedent's negligence was a substantial factor in causing damage to Ralphs's big rig. The jury assessed 90 percent responsibility for the accident to Decedent, and 10 percent to Horn. Both parties were awarded damages based on their claims. After adjusting the awards to reflect the jury's allocation of fault, a final judgment was entered against Ralphs in the amount of $475,298.40.
F. Posttrial Motions
On August 1, 2007, Ralphs filed notice of its intent to move for a new trial or judgment notwithstanding the verdict on the following grounds: (1) irregularity in proceedings; (2) conduct of the jury; (3) excessive damages; (4) insufficiency of the evidence to justify the verdict; and (5) error of law occurring at trial. The motions were filed on August 6. Specifically, Ralphs argued that (1) there was no evidence that Horn owed any duty to Decedent; (2) the intervening superseding negligence of Decedent exonerated defendants from all liability; (3) the court erred in allowing Officer Migliacci to testify that he could have given Horn a ticket; (4) the verdict was against the law because there was no evidence that Horn's actions created a risk different from that which already existed at the time of Decedent's negligent conduct; *Page 10 
(5) the noneconomic damages were excessive; and (6) the trial court erred in denying costs and fees to defendants. In the motion for judgment notwithstanding the verdict, Ralphs argued that Horn owed no duty to Decedent and that the intervening superseding negligence of Decedent exonerated Ralphs from all liability.
Plaintiff opposed Ralphs's motions, arguing that "the issue is whether Mr. Horn was negligent in his duty to operate Ralphs' tractor-trailer in a safe manner and whether parking that truck on the side of the I-10 freeway in an `Emergency Parking Only' area was a breach of that duty." Regarding the R45 sign, Plaintiff claimed "the issue is whether Mr. Horn had a duty to operate Ralphs' tractor-trailer safely, independent
of the R45 sign, and whether he was negligent in stopping in an `Emergency Parking Only' area to drink some water and have a banana. Mr. Horn's status as a driver confers his duty of care, not the R45 sign." (Original underscoring.) Regarding superseding cause, Plaintiff argued that the basic rule is that "the negligence of a third person which is the immediate cause of the injury may be viewed as a superseding cause only when it is so highly extraordinary as to be unforeseeable." (Original boldface italics.) Thus, in this case, Plaintiff asserted "it is reasonably foreseeable that a `speeding and/or intoxicated driver' would lose control while driving on the I-10 freeway, veer off the freeway and crash into a truck parked on the side of the freeway."
Following argument, the trial court denied Ralphs's motions. Regarding the motion for judgment notwithstanding the verdict, the court found that emphasis by Ralphs on the R45 sign was misplaced because the jury was "not instructed on a negligence per se theory. . . ." As to Decedent's negligence as a superseding cause, the court found that it was foreseeable "that a negligent driver could drift off the freeway and onto the dirt next to the shoulder Regarding the motion for new trial, the court found that whether Horn owed a duty to Decedent "is dependent on the foreseeability of risk" and "[i]t was foreseeable that a driver on that highway could lose control of his vehicle, that it would depart the traveled portion at a high speed and that it would collide with any vehicle parked [on] the dirt area beyond the shoulder." As for the superseding cause, the court found that it was within the scope of the evidence for the jury to find that if Horn had not been parked there, Decedent might have decelerated without hitting anything, or that he could have finished his left turn and made it back to the freeway. The court further found that the verdict was not against the law and that the noneconomic damages were supported by the evidence.
 II. JUDGMENT NOTWITHSTANDING THE VERDICT
"A party is entitled to a judgment notwithstanding the verdict on a timely motion if there is no substantial evidence to support the verdict and the *Page 11 
evidence compels a judgment for the moving party as a matter of law. [Citations.] If the motion challenges the sufficiency of the evidence to support the verdict, we review the ruling under the substantial evidence standard. [Citations.] If the motion presents a legal question based on undisputed facts, however, we review the ruling de novo. [Citation.] If we determine that the trial court denied a motion for judgment notwithstanding the verdict that should have been granted, we must order the entry of judgment in favor of the moving party. [Citation.]" (Gillan v. City of SanMarino (2007) 147 Cal.App.4th 1033, 1043-1044
[55 Cal.Rptr.3d 158].)
A. Duty
Ralphs contends that it is entitled to judgment notwithstanding the verdict because, as a matter of law, it (via its driver Horn) owed no duty to Decedent. We agree.
Plaintiff claimed that Horn was negligent in stopping in an "Emergency Only Parking" area on the side of the freeway for a nonemergency. While Plaintiff denies that the case proceeded on a negligence per se theory, and the trial court stated that the jury was not instructed on negligence per se, we note that Plaintiff emphasized both the R45 sign and the fact that Horn stopped in an "Emergency Only Parking" area. Nonetheless, we accept the representations of the court and Plaintiff and proceed to analyze the existence of a duty, if any, on the part of Horn under a general negligence theory.
"The well-known elements of a cause of action for negligence are duty, breach of duty, proximate cause, and damages. [Citation.] The threshold element of the existence of duty is a question of law to be resolved by the court. [Citation.]" (Minch v. Department of California HighwayPatrol (2006) 140 Cal.App.4th 895, 900-901
[44 Cal.Rptr.3d 846].) On appeal, we apply a de novo standard of review. (Garcia v. Paramount Citrus Assn., Inc. (2008)164 Cal.App.4th 1448, 1453 [80 Cal.Rptr.3d 512].) "In a posttrial procedural setting, we view the facts, where supported by substantial evidence, in the light most favorable to the plaintiff. [Citation.]" (Ibid.)
In the late 1800's, the concept of duty was created as a legal means "to curtail the feared propensities of juries toward liberal awards." (Dillon v. Legg (1968) 68 Cal.2d 728,734 [69 Cal.Rptr. 72, 441 P.2d 912].) In analyzing duty, we must ask "`whether the plaintiffs interests are entitled to legal protection against the defendant's conduct. . . . It [duty] is a shorthand statement of a conclusion, rather than an aid to analysis in itself. . . . But it should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' [Citation.]" (Ibid.) *Page 12 
As a general rule, a person is liable for injuries caused by his or her failure to exercise reasonable care. (Pattersonv. Sacramento City Unified School Dist. (2007)155 Cal.App.4th 821, 828 [66 Cal.Rptr.3d 337].) However, the decision to depart from this general rule requires courts to balance the following policy considerations, which include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" (Rowland v. Christian
(1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561].)
The foreseeability of harm has become a chief factor in determining whether a duty exists. (Scott v. ChevronU.S.A. (1992) 5 Cal.App.4th 510, 515-516.) Nonetheless, our task "is not to decide whether a particular plaintiffs injury was reasonably foreseeable in light of a particular defendant's conduct, but to evaluate `generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.' [Citation.]" (Avis Rent a Car System, Inc. v. Superior Court (1993)12 Cal.App.4th 221, 232 [15 Cal.Rptr.2d 711].)
According to Plaintiff, "it was reasonably foreseeable that a `speeding and/or intoxicated driver' would lose control while driving on the I-10 freeway, veer off the freeway and crash into a vehicle parked on the shoulder of the freeway. In addition, Horn knew that he was parked next to a busy freeway and that at any moment a vehicle could exit the road for any reason. In fact, [Ralphs] told [its] drivers not to park in emergency parking only areas for nonemergency reasons because of safety concerns for both the driver and other motorists should they leave the roadway." More importantly, Horn stopped to use the area as his "personal lunch spot."
Under the facts of this case, we find, as a matter of law, that Horn's conduct was not wrongful towards Plaintiff. A reasonable person would not conclude that Horn's act of stopping on the side of the freeway, 16 feet from lane four, in the dirt area, would subject motorists using the freeway to an unreasonable risk of harm. Given the thousands of motorists who pass the area during the time of Horn's stop, it is not reasonable to foresee this type of accident. *Page 13 
Plaintiff relies on the following to support her claim of negligence: (1) Horn stopped on the side of a freeway; (2) the motorists were traveling at high rates of speed; (3) the area was marked as "Emergency Stopping Only"; (4) Horn did not have an emergency; and (5) Ralphs advised its drivers not to stop on the side of a freeway. However, there was no evidence of any similar accidents that occurred as a result of a motorist who was stopped in the dirt area, off the shoulder of the freeway. Nor was there evidence of any obstacles or unusual road conditions that would have caused Decedent to go off the road. Further, there is no evidence that an ordinarily prudent person would have understood that he or she was subjecting Decedent to an unreasonable risk of harm by having stopped off the shoulder of the freeway, some 16 feet from lane four. (Arthur v.Santa Monica Dairy Co., supra, 183 Cal.App.2d at p. 489
["[I]t is not ordinarily to be expected that drivers of automobiles will run head-on into cars ahead of them which are in plain sight and have been long stopped. . . ."].) The collision did not occur as a result of Horn attempting to pull over to the side of the freeway (decelerating) or getting back on the freeway (accelerating). Horn's big rig was stopped in plain sight.
The fact that it is possible for a motorist to leave his or her lane on a freeway and strike something situated off the shoulder of the road, such as a defendant's vehicle, does not create a "duty" on the part of a defendant to ensure a "safe landing."[7] If it did, the defendant would be required to eliminate all possibilities of risk. This is simply not possible. "All possibilities of risk even if `foreseeable' in the abstract as possibilities cannot be eliminated." (Whitton v. State of California (1979)98 Cal.App.3d 235, 244 [159 Cal.Rptr. 405].) All that a defendant is required to do is to protect a plaintiff from all reasonably foreseeable risks. (Bryant v. Glastetter (1995)32 Cal.App.4th 770, 778 [38 Cal.Rptr.2d 291] [Fourth Dist., Div. Two] ["`In order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably foreseeable.'"].) To expect that most people will drive with ordinary care or due caution is not negligence. Thus, the chance that an unusual accident will occur is not the test of foreseeability.
As Ralphs points out, because the area was designated as a safe place to stop for emergency purposes, "a motorist stopping in the area could conceivably owe a duty only to other motorists who might need to stop for emergencies but could not do so because the area was already occupied." *Page 14 
Under such circumstances, it is reasonably foreseeable that the presence of Ralphs's big rig could subject a motorist to harm if the motorist was unable to make an emergency stop. There is no evidence that such was the case here. Thus, the reason for Horn's stop is wholly immaterial to the duty analysis. Plaintiffs emphasis that Horn stopped to have a bite to eat is a red herring. If an emergency situation had caused Horn to stop in the same place, it would not have been any safer.
In support of the argument that Ralphs owed a duty to Decedent, Plaintiff relies on Jackson v. Ryder Truck Rental,Inc. (1993) 16 Cal.App.4th 1830 [20 Cal.Rptr.2d 913] (Jackson) and Bigbee v. Pacific Tel. Tel.Co. (1983) 34 Cal.3d 49 [192 Cal.Rptr. 857, 665 P.2d 947] (Bigbee). In Jackson, the plaintiffs decedent was struck by a passing motorist after the decedent had pulled his truck off the road because its electrical system failed. (Jackson, supra, at p. 1835.) The defendant had contracted with the decedent's employer to maintain the employer's trucks. (Ibid.) Our colleagues in the Third District reversed summary judgment for the defendant, holding that the evidence was sufficient to support a conclusion that the defendant negligently maintained the truck, and that such negligence caused the truck to pull off the road. (Id.
at pp. 1837, 1852.) The court further held that "the general duty of exercising due care toward the [employee] to protect him against the type of risk he encountered [wa]s properly imposed on [the defendant] as a matter of law. . . ." (Id. at p. 1846.)
In Bigbee, the plaintiff was injured when a drunk driver struck the telephone booth in which he was standing, situated approximately 15 feet from a busy Los Angeles street. (Bigbee, supra, 34 Cal.3d at pp. 52, 54.) Our state's highest court reversed summary judgment in favor of the defendants, holding that foreseeability remained a triable issue of fact for the jury. (Id. at p. 60.) The court explained that "`foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' [Citation.]" (Id. at p. 57.)
Plaintiffs reliance on Jackson and Bigbee is misplaced. In each case, the defendants placed the victims in positions where they were exposed to harm from other third party negligent motorists. Here, Ralphs did nothing to place Decedent in harm's way. Decedent was driving his pickup on the I-10 freeway and perhaps fell asleep at the wheel. The fact that Horn stopped in an "Emergency Parking Only" area is of no consequence because it was not reasonably foreseeable that this category of victims (ones like Decedent) would be harmed in this manner in light of Horn's conduct. Horn's big rig was 16 feet away from lane four, off the shoulder of the freeway. Imposition of a duty of care under the facts of this case would do little to prevent future *Page 15 
injuries, since Decedent, perhaps, fell asleep at the wheel before the accident. However, the burden to defendants of imposing a duty would be significant. More importantly, we note that Bigbee analyzed foreseeability as a jury question (Bigbee, supra, 34 Cal.3d at p. 56), not the legal question presented by the duty analysis in our case (Ann M.v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 674
[25 Cal.Rptr.2d 137, 863 P.2d 207]). Jackson followedBigbee.[8] (Jackson, supra,16 Cal.App.4th at pp. 1839-1840.)
If a duty is imposed under the facts of this case, where does it end?[9] Taken to its logical conclusion, wherever there is no safe landing, liability will be found. Thus, a motorist who parks his car on the side of the street, or a homeowner who chooses to install a brick mailbox, even a public entity that wants to beautify its streets with trees, will be subject to liability if a vehicle leaves the road, collides with the offending object, and the driver or passenger suffers injury. As the dissent holds, "a person . . . [has] the general duty to avoid injuring others by acting carelessly." (Dis. opn.,post, at p. 28.) The question becomes, what amounts to careless actions? Given the dissent's broad definition, the possibilities are endless.
Moreover, Ralphs argues the presence of the R45 sign means the area is a safe place to stop.[10] If it is not, then Caltrans would install a no-stopping or no-standing sign. Ralphs notes that Plaintiffs experts agreed that "even if the sign had not been there, drivers with emergencies could — and should — stop on the shoulder for their own safety and that of other motorists." Plaintiffs traffic engineering expert, Dr. Thomas Schultz, agreed that a vehicle stopped for such a purpose would create the same risk as was created by Horn's big rig. Because the risk created by Horn's nonemergency stop was no greater than if he or another motorist had stopped for an emergency, Horn's conduct *Page 16 
did not create an "unreasonable risk of harm." (Cf.Richards v. Stanley (1954) 43 Cal.2d 60, 64-65
[271 P.2d 23].)
Again, while it is possible for a vehicle to leave the freeway and strike an object stopped off the shoulder, "[t]his is not the foreseeability upon which the law of negligence is based. The conduct of [Horn] was not the cause-in-fact or the substantial factor in law in bringing about the harm to [Decedent]. When the law says a person substantially contributes to the injury, the law is dealing with responsibility based on reasonable expectations and a common-sense approach to fault not physics. [Citations.] Therefore, even if the likelihood of [a vehicle leaving the freeway and hitting another vehicle stopped off the shoulder] . . . can be calculated in terms of mathematical probabilities, such mathematic computation is immaterial." (Whitton v.State of California, supra, 98 Cal.App.3d at p. 243.) Clearly, there are some risks that are not reasonably foreseeable. Thus, there is no duty. Such is the case before this court.
B. Proximate Cause
Notwithstanding the above, Ralphs argues it was also entitled to judgment notwithstanding the verdict because there is no substantial evidence that Horn's alleged negligence proximately caused the collision. Again, we agree.
Proximate cause involves two elements: (1) cause in fact, and (2) the extent to which public policy considerations limit a defendant's liability for its acts. (PPG Industries, Inc.v. Transamerica Ins. Co. (1999) 20 Cal.4th 310, 315-316
[84 Cal.Rptr.2d 455, 975 P.2d 652] [holding that an insurer's negligent failure to settle a personal injury lawsuit was a cause in fact, but not a proximate cause, of the award of punitive damages].) The first element, cause in fact, is established if an act "`is a necessary antecedent of an event,'" and this element "`is a factual question for the jury to resolve.' [Citation.]" (Ferguson v. Lieff, Cabraser,Heimann Bernstein (2003) 30 Cal.4th 1037, 1045
[135 Cal.Rptr.2d 46, 69 P.3d 965].) The second element is "` "concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct."` [Citation.]" (Ibid., [holding that public policy considerations strongly militated against allowing a plaintiff to recover lost punitive damages as compensatory damages in a legal malpractice action].) "Because the purported causes of an event may be traced back to the dawn of humanity," the law imposes additional limits on liability that are not related to "`simple causality.'" (Ibid.)
Assuming that Horn owed Decedent a legal duty of care, Ralphs is still not liable for Plaintiffs injuries unless Horn's breach of that duty was a *Page 17 
substantial factor in causing such injuries. (Saelzlerv. Advanced Group, 400 (2001) 25 Cal.4th 763, 772, 765-767,781 [107 Cal.Rptr.2d 617, 23 P.3d 1143] [property owner not liable to plaintiff who had been assaulted where evidence showed merely a "speculative possibility" that additional security would have prevented the assault].) Although proximate cause ordinarily presents a question of fact, "it becomes a question of law when the facts of the case permit only one reasonable conclusion. [Citations.]" (Capolungo v.Bondi (1986) 179 Cal.App.3d 346, 354 [224 Cal.Rptr. 326].)
"A tort is a legal cause of injury only when it is a substantial factor in producing the injury. [Citation.]" (Soule v. General Motors Corp. (1994) 8 Cal.4th 548,572-573 fn. 9 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Abstract negligence is insufficient to support a judgment against a defendant. Instead, there must be "substantial evidence of a causal connection between [a defendant's] negligent acts or omissions and plaintiffs' injuries. [Citations.]" (Dixon v. City of Livermore (2005)127 Cal.App.4th 32, 43 [25 Cal.Rptr.3d 50].)
Our review of the record persuades us there is no substantial evidence to support a finding that the accident was due to the negligence of Horn. To begin with, the fact that the area where Horn stopped was for "Emergency Parking Only" is irrelevant. (Bentley v. Chapman, supra, 113 Cal.App.2d at p. 4
[discussing negligence per se and holding that parking over the time limit "could not, as a matter of law, be deemed a proximate cause of plaintiffs' injuries"]; see alsoCapolungo v. Bondi, supra, 179 Cal.App.3d at p. 355.)
Next, the Plaintiffs expert, Anderson, concluded that, but for Horn's presence, Decedent would have returned safely to the freeway. There are three reasons why this opinion cannot support liability. First, whether or not Horn's reason for parking involved an emergency, the fact remains the area is available for emergency parking. Second, according to the testimony of the witnesses, Decedent's driving was erratic. He was speeding, swerving within his lane, he made an abrupt change of lanes causing another big rig driver to apply his brakes to avoid collision, and he never attempted to slow down or apply his brakes according to percipient witnesses. And third, as we discuss in the next part, we find Anderson's opinion to be faulty and incompetent, amounting to nothing more than total speculation.[11] We find that it is speculative to conclude the accident would not have occurred but for the *Page 18 
presence of Horn's big rig. The record does not contain substantial evidence that Plaintiffs injuries were caused by the negligent act or omission of Horn. Accordingly, there is no basis to hold Ralphs liable for Horn's negligence, and we must reverse the judgment.
Notwithstanding our conclusion that the record does not contain substantial evidence that Horn's negligent act or omission caused Plaintiffs injuries, we also conclude that, as a matter of public policy, Plaintiff cannot recover against Ralphs based on the facts in the record.
In Vons Companies, Inc. v. Seabest Foods, Inc. (1996)14 Cal.4th 434 [58 Cal.Rptr.2d 899, 926 P.2d 1085], the court explained that the public policy considerations element of proximate causation is a "`policy-based legal filter on "but for" causation'" that courts apply "'"to those more or less undefined considerations which limit liability even where the fact of causation is clearly established."' [Citation.]" (Id. at p. 464.) Because this prong focuses on the public policy considerations limiting liability, and not on the fact of causation, it is a question of law for the court. (Milwaukee Electric Tool Corp. v. Superior Court
(1993) 15 Cal.App.4th 547, 563 [19 Cal.Rptr.2d 24]; Brewerv. Teano (1995) 40 Cal.App.4th 1024, 1035
[47 Cal.Rptr.2d 348] ["`Whether a defendant's conduct is an actual cause of a plaintiffs harm is a question of fact, but the existence and extent of a defendant's liability is a question of law and social policy.'"].)
Here, Plaintiffs theory of liability is that Horn was negligent in stopping in the dirt area approximately 16 feet from the number four lane of the I-10. However, vehicles stop along the side of the freeway every day for any number of reasons. Some experience emergencies, while others are stopped by a CHP officer who is issuing a moving violation citation. Nonetheless, the nature and degree of the connection between Horn's act of stopping and Decedent's collision with Horn's big rig of which Plaintiff complains was, as a matter of public policy, too attenuated to support imposing liability on Ralphs.[12] *Page 19 
Accordingly, judgment for Ralphs notwithstanding the verdict on Plaintiffs negligence claim was proper.
C. Admission of Evidence
In proving causation, Plaintiff primarily relied on the testimony of Anderson. Despite numerous objections by Ralphs, the trial court allowed Anderson to opine that Decedent was awake and alert, attempting to return to the freeway, at the time of the collision. More specifically, Anderson testified, contrary to the eyewitness testimony, that Decedent was braking and not traveling faster than 60 miles per hour. Based on Anderson's testimony, Plaintiff argued that the presence of Ralphs's big rig was a substantial factor in bringing about Decedent's death.
Ralphs contends that Anderson's opinions were based on facts that were never established at trial, and thus, the trial court erred in admitting them. We agree.
"A trial court's ruling on the admissibility of evidence is generally reviewed for abuse of discretion. [Citations.]" (Zhou v. Unisource Worldwide (2007)157 Cal.App.4th 1471, 1476 [69 Cal.Rptr.3d 273].) Evidence Code section 801, subdivision (b), permits an expert to base an opinion only on his personal observations or on matters "of a type that reasonably may be relied upon" by experts in forming opinions on the particular subject. "[A]ny material that forms the basis of an expert's opinion testimony must be reliable. [Citation.] For `the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' [Citation.]" (People v. Gardeley (1996) 14 Cal.4th 605, 618
[59 Cal.Rptr.2d 356, 927 P.2d 713].) "Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has *Page 20 
no evidentiary value. [Citations.]" (Pacific Gas Electric Co. v. Zuckerman (1987) 189 Cal.App.3d 1113,1135; see Hyatt v. Sierra Boat Co. (1978)79 Cal.App.3d 325, 338-339 [145 Cal.Rptr. 47] [an expert's "assumption of facts contrary to the proof destroys the opinion"].)
Anderson relied on the CHP report and a photograph taken by the CHP. Over Ralphs's objection, the trial court permitted Anderson to testify that mark No. 1 on the factual diagram was labeled in the CHP report as a tire mark (impression in the dirt) from Decedent's pickup, and a second mark, No. 2, on the factual diagram was labeled a side skid from the pickup.[13]
Anderson thus concluded these marks came from the pickup's left rear tire. Anderson explained that, if the pickup's right side tires were placed on the first mark, the pickup would hit the trailer "across the entire front of the pick-up truck," which would be inconsistent with the damage on the pickup. However, he stated, if the first mark represented the left side tires, and the pickup was going straight, then the pickup would have missed the big rig. But, Anderson testified, "if I visualize [the pickup] being in a left turn as if it were trying to regain the Interstate 10 highway here, and the left rear tire is making that mark [No. 1], . . . it matches [the damage to the pickup]. And that's the only combination I could come up with of tires that would make that mark." Anderson reasoned that the second mark (No. 2) must have been made by the pickup's left rear tire when it rotated after the impact because he had "trouble finding an explanation for any other reason why marks of this nature would be out there."
Anderson also opined that Decedent was applying his brakes when he hit the big rig. However, as Ralphs notes, such opinion depends on the assumption that mark No. 1 was from the pickup. Such assumption is based solely on the CHP report that labeled those marks as coming from the pickup. However, the officer who documented the marks (T. Thibodeau) never testified at trial. (Evid. Code, § 702, subd. (a) [a witness's testimony "is inadmissible unless he has personal knowledge of the matter."].) No other documentary evidence or testimony supported a conclusion that the marks came from the pickup. The CHP report (with the exception of the one-page factual diagram and certain photographs) was excluded from admission. (Veh. Code, § 20013; Carlton v. Department of MotorVehicles (1988) 203 Cal.App.3d 1428, 1432, 1433 fn. 1 [250 Cal.Rptr. 809] [police officer's opinion in traffic accident report that plaintiff was "most responsible for the accident" was inadmissible hearsay].) Officer Migliacci, the only investigating officer to testify, did not establish that the marks represented a tire mark *Page 21 
and skid mark from the pickup. He stated that he did not take the measurements; he did not know how long the marks had been in the dirt; he did not match the tread on the marks with the pickup's tires, nor was he aware of any other physical evidence that would confirm the marks' origin; and he had no basis to believe that the marks were made by the pickup other than that Officer Thibodeau, who documented the marks, labeled them as such.
Given the lack of any evidence which established that the tire/skid marks were from Decedent's pickup, Anderson's opinion that Decedent would have returned safely to the freeway but for Horn's parked big rig was speculation. (Hyatt v. SierraBoat Co., supra, 79 Cal.App.3d 325, 338-339 ["an expert's assumption of facts contrary to the proof destroys the opinion."].) Even if Decedent were in a turn toward the freeway, it is sheer speculation that he would enter traffic under control.
According to eyewitness testimony, Decedent's driving prior to the collision was erratic. Perez testified that Decedent was traveling between 70 and 80 miles per hour when he suddenly turned right as if attempting to exit the freeway. Decedent crossed the number four lane and the shoulder of the freeway, and then drove directly into the big rig. Decedent never applied his brakes or his turn signals, nor was there any indication that he tried to reduce his speed or avoid the big rig. As Ralphs points out, Plaintiffs own human factors expert opined that Decedent was fighting drowsiness and finally fell asleep, causing him to leave the number three lane.[14]
Given the above, we agree with Ralphs and conclude that Anderson's opinions were unfounded and speculative. "Although it is true that the testimony of a single witness may be sufficient to constitute substantial evidence [citation], `[w]here an expert bases his conclusion upon . . . factors which are speculative, remote or conjectural, . . . the expert's opinion cannot rise to the dignity of substantial evidence.' [Citation.] As . . . explained in Jones v. OrthoPharmaceutical Corp. (1985) 163 Cal.App.3d 396
[209 Cal.Rptr. 456] (an action against the manufacturer of a contraceptive drug where the plaintiff claimed she developed cancer after taking the pills), `[t]here can be many possible "causes," indeed, an infinite number of circumstances which can produce an injury. . . . A possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limitof inference upon which an issue may be submitted to the jury.
. . . [¶] The fact that a determination of causation is difficult to establish cannot . . . provide a plaintiff with an excuse to dispense *Page 22 
with the introduction of some reasonably reliable evidence proving this essential element of his case. [Experttestimony] can enable a plaintiffs action to go to the juryonly if it establishes a reasonably probable causal connectionbetween an act and a present injury.' [Citation.]" (Leslie G. v. Perry Associates (1996)43 Cal.App.4th 472, 487 [50 Cal.Rptr.2d 785], fn. omitted.)
For the above reasons, we agree with Ralphs and find that "Anderson's opinion on causation was not factual analysis, but whimsical theory." As such, it does not constitute substantial evidence of causation. Moreover, the trial court abused its discretion in allowing admission of the expert's opinion. "[E]ven when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors [citation], has no evidentiary value [citation] and may be excluded from evidence. [Citations.] Similarly, when an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an `expert opinion is worth no more than the reasons upon which it rests.' [Citation.]
"Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide? [Citation.] Therefore, an expert's opinion that something could be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist in the case before the jury, does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities. [Citation.] Similarly, an expert's conclusory opinion that something did occur, when unaccompanied by a reasoned explanation illuminating how the expert employed his or her superior knowledge and training to connect the facts with the ultimate conclusion, does not assist the jury. In this latter circumstance, the jury remains unenlightened in how or why the facts could support the conclusion urged by the expert, and therefore the jury remains unequipped with the tools to decide whether it is more probable than not that the facts do support the conclusion urged by the expert. An expert who gives only a conclusory opinion does notassist the jury to determine what occurred, but instead supplants the jury by declaring what occurred." (Jennings v. Palomar Pomerado Health Systems,Inc. (2003) 114 Cal.App.4th 1108, 1117-1118
[8 Cal.Rptr.3d 363].)
Anderson's testimony, when viewed by itself or with the circumstantial evidence, failed to create a triable issue of material fact on causation. *Page 23 
Accordingly, the trial court abused its discretion in overruling Ralphs's objection and allowing the jury to hear the testimony.[15]
 III. DISPOSITION
The judgment is reversed and the matter is remanded to the trial court with directions to grant Ralphs's motion for judgment notwithstanding the verdict. Ralphs is entitled to costs on appeal.
McKinster, J., concurred.
[1] Although Ralphs Grocery Company and Hen Horn were parties at the trial level, Ralphs is the only named defendant on appeal.
[2] Although Maria Cabral and her children were parties at the trial level, Maria Cabral is the only named plaintiff on appeal.
[3] Plaintiffs expert opined that, based on the damage to the pickup, Decedent was traveling 60 miles per hour, plus or minus 10 miles per hour.
[4] Horn had stopped to have something to eat and drink.
[5] Prior to the accident, someone had called 911 to report Decedent's erratic driving.
[6] The R45 sign was installed on August 30, 2001, at the request of the CHP. The sole purpose of the R45 sign was to identify an area where vehicles with emergencies could park safely. The deputy district director of traffic operations for California's Department of Transportation (Caltrans) region 8 testified that the R45 sign was not designed or intended to protect negligent drivers who leave the roadway and run into vehicles within the designated parking area.
[7] Our dissenting colleague claims he is not creating a duty to ensure a "safe landing." (Dis. opn., post, at p. 27.) Instead, he asserts that he is merely staying with the general rule that "each person has a duty to use due care to avoid injuring others by their careless conduct." (Ibid.) We assume such rule equally applies to a motorist who has suddenly left his lane of traffic, cut in front of another motorist, crossed over the paved shoulder of the freeway, and entered the dirt side of the freeway at a high rate of speed.
[8] Both Bigbee and Jackson were summary judgment cases. In reversing the grant of summary judgment, both cases noted that duty is a question of fact. After AnnM. determined duty is a legal issue, it appears these two cases no longer have any vitality.
[9] Our colleague responds by asking: "If a duty isnot imposed under the facts of this case, then where does it begin? Are drivers only required to exercise reasonable care while moving in the flow of traffic? If not, when a driver who has stopped on the shoulder of the interstate starts to rejoin the flow of traffic, then at what distance from the flow of traffic does that driver's duty to use reasonable care begin, three feet, nine feet? It is my opinion that parking along the shoulder of an interstate does not exempt a person from the general duty to avoid injuring others by acting carelessly." (Dis. opn., post, at p. 28.) Our colleague is comparing apples to oranges. We freely acknowledge that, had Horn been merging into (or departing from) traffic, our analysis might differ. However, such is not the case. Horn's vehicle was stopped, 16 feet from the freeway, in plain view, in an area where emergency stopping was permitted. Horn was not stopped in the roadway, nor was Decedent's ability to navigate road surfaces impaired in any way.
[10] What if there had been a tree, a sign, or a ditch at the exact location of the impact between Decedent's pickup and Ralphs's big rig? Would this make a difference?
[11] Had the trial court correctly followed its original rulings and not allowed Anderson to base his conclusion on unreliable facts and/or assumptions that are not supported by the record (see discussion, post), this case never would have been decided by a jury. However, because it did proceed to a jury verdict, the dissent overlooks the procedural errors and applies a deferential review of the record. (Dis. opn., post, at p. 30.) The problem with the dissent's approach is that it puts the cart before the horse. Because the court erred in allowing the jury to hear Anderson's testimony, the basis for the jury's verdict is suspect. When the faulty testimony is removed, there is nothing to support the jury's verdict, much like when a foundational card is removed and the house of cards falls.
[12] Our holding is in accord with numerous judicial decisions in other states. (See, e.g., Bogovich v. NalcoChemical Co. (1991) 213 Ill.App.3d 439, 443-444
[157 Ill.Dec. 579, 572 N.E.2d 1043, 1046] [automobile accident was not proximately caused by defendant's alleged negligence in parking on the median]; Long v. Soderquist (1984)126 Ill.App.3d 1059, 1064 [82 Ill.Dec. 80, 467 N.E.2d 1153, 1156] [placement of defendant's vehicle was not a proximate cause of a subsequent collision as a matter of law]; Sheehan v.Janesville Auto Transport (1981) 102 Ill.App.3d 507, 511
[58 Ill.Dec. 189, 430 N.E.2d 131, 133] [defendant's vehicle, even if parked illegally, was not proximate cause of collision]; Smith v. Perm Line Serv. (1960)145 W.Va. I, 19-20 [113 S.E.2d 505, 516] [plaintiff passenger, whose car struck a truck that was parked on the highway, was denied recovery of damages because the driver of the car was the proximate cause of plaintiffs injuries]; Duff v.Lykins (Ky. 1957) 306 S.W.2d 252, 254-255 [owner of truck parked on a state highway within the city limits was not liable for injuries sustained by occupant of a vehicle that collided with the unlighted truck at night where such parking was not prohibited by city ordinance]; Godwin v. Nixon (1953)236 N.C. 632, 641, 642 [74 S.E.2d 24, 30-31] [plaintiff, whose car struck rear of tractor-trailer which was negligently parked, was denied recovery as a matter of law because the sole proximate cause of such accident was the driving of the car into the parked trailer when the driver saw or should have seen the parked trailer]; Scott v. Hoosier Eng'g Co. (1936)117 W.Va. 395, 397-398 [185 S.E. 553] [plaintiff had a duty to pay attention to his view of the road and thus manner in which defendant's truck was parked, even though in violation of statute, did not proximately cause the accident].) There is also limited contrary authority. (Cf. Hicks v. Tilquit
(La.Ct.App. 1955) 82 So.2d 100, 102.)
[13] While the factual diagram was admitted into evidence, the designation of mark Nos. 1 and 2 as being made by Decedent's pickup was not part of the factual diagram and appears in a part of the CHP report not admitted at trial.
[14] In contrast, Ralphs's human factors expert opined that an undiagnosed medical condition caused Decedent, who was five feet 11 inches tall and weighed 350 pounds, to leave the freeway and drive into the big rig.
[15] Without going into an extensive discussion, we likewise find that Anderson's opinion that Decedent was traveling no faster than 60 miles per hour is also unsupported by the record.