Filed 12/31/25  Newells v. County of Los Angeles CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| MATTHEW NEWELLS et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>Defendants and Respondents. | B339576<br><br>Los Angeles County<br>Super. Ct. No. 19STCV07742<br><br>**ORDER MODIFYING OPINION**<br>**[No Change in Judgment]** |

THE COURT:

The opinion herein, filed on December 23, 2025, is modified as follows.

At page 1, third paragraph, add counsel "James C. Jardin," so that it reads:  Collins + Collins, Brian K. Stewart, Erin R. Dunkerly and James C. Jardin for Defendants and Respondents.

There is no change in the judgment.

_____

RICHARDSON, Acting P. J.

Filed 12/23/25  Newells v. County of Los Angeles CA2/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MATTHEW NEWELLS et al., | B339576 |
| Plaintiffs and Appellants, | |
| v. | Los Angeles County Super. Ct. No. 19STCV07742 |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne Hwang, Judge. Affirmed.

McNicholas & McNicholas, Matthew S. McNicholas, Jeffrey R. Lamb and Richard W. Powers for Plaintiffs and Appellants.

Collins + Collins, Brian K. Stewart and Erin R. Dunkerly for Defendants and Respondents.

_____

This case arises from an automobile wreck with tragic consequences. Preciosa Lerena, who is not a party to this action, stole a car, ran a red light at over 80 miles per hour, and slammed into plaintiffs' car as it was negotiating an intersection in Palmdale.

Plaintiff Matthew Newells sustained serious physical injuries, as did his son and stepsons, the three other plaintiffs. His wife Christine Newells, mother to the three other plaintiffs, was killed.

Lerena was convicted of second degree murder.

Plaintiffs sued defendant County of Los Angeles[1] for the conduct of its sheriff's deputies in the time leading up to the wreck; defendant's hiring, training, retention, and supervision of those deputies; and how the pursuit of Lerena was managed.

The trial court granted defendant's motion for summary judgment. We agree with the trial court that summary judgment was proper and affirm.

---

[1] Plaintiffs also sued Los Angeles County Sheriff's Department (LACSD), which is a subunit of the county. (*Trejo v. County of Los Angeles* (2020) 50 Cal.App.5th 129, 135.) As such, we refer to the county and LACSD collectively as "defendant." We additionally note that plaintiffs' operative second amended complaint (SAC) named Deputies George Hanley and William Warner as defendants. On appeal, plaintiffs address only the trial court's grant of "Respondents County of Los Angeles and County of Los Angeles Sheriff's Department's . . . (collectively, 'Respondents') motion for summary judgment." (Some capitalization omitted.) To the extent plaintiffs intended their term "Respondents" to embrace the individual deputies, our reference to "defendant" embraces them as well.

# BACKGROUND

## I.   Facts

At about 2:23 on a Sunday afternoon in February 2018, Lerena assaulted a woman in a Walmart parking lot in Palmdale and drove off in the victim's Toyota RAV4.

Lerena proceeded to drive the RAV4 erratically and at high speeds around Palmdale.

Several motorists called 911 to report Lerena's driving.

At about 3:00 p.m., LACSD dispatch put out a broadcast to its patrol units that a carjacking suspect had been spotted driving eastbound on Elizabeth Lake Road at Ranch Center Drive and asked for deputies to respond. Deputies Hanley and Warner, who were in separate marked LACSD vehicles with their respective partners, responded to the broadcast. A dispatcher authorized them to proceed, with their lights and sirens activated, to the suspect's last known location.

At around the same time, one motorist who called 911 chose to follow Lerena while he remained on the line with the LACSD 911 dispatcher. In doing so, he related information about Lerena's driving that made clear he was following her. Plaintiffs contend the dispatcher never told the caller to stop, and even asked him to follow Lerena.[2] At one point, while heading

---

[2]     We say "contend" because plaintiffs cite only to their separate statement of undisputed facts, not actual evidence, in support. "A separate statement is not, in and of itself, evidence." (*Brown v. El Dorado Union High School Dist.* (2022) 76 Cal.App.5th 1003, 1020; see also *Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1378–1379.) Moreover, the evidence cited in the separate statement is an audio recording not included in the record (only an image of the physical media purported to contain the recording is).

3

westbound on Elizabeth Lake Road, Lerena pulled over and stopped. The caller pulled up next to her, told her to stay in her car, and got out of his car to talk to her. As soon as he got out of his car, she did a U-turn. He got back in his car to continue following her but lost sight of her.

When Deputies Hanley and Warner responded to the dispatcher's broadcast, they were in the vicinity of Elizabeth Lake Road and Tierra Subida Avenue, which is over three miles east of Elizabeth Lake Road and Ranch Center Drive, where Lerena was last reported. Both Deputies Warner and Hanley drove north on Tierra Subida Avenue to approach the intersection and needed to make a left turn to head west on Elizabeth Lake Road towards the suspect's last reported location.

Deputy Hanley arrived at the intersection first, followed shortly thereafter by Deputy Warner. When they arrived at the intersection, the three lanes of northbound traffic were stopped by red traffic lights—a red arrow stopping the left turn lane and a red light stopping the two lanes to the right. Plaintiffs' vehicle was waiting in the first position in the left turn lane.

In order to allow the two LACSD vehicles to safely turn left at the intersection against the red arrow, Deputy Hanley[3] "cleared the intersection" by stopping his vehicle in front of

---

[3] We note in their briefing plaintiffs say it was Deputy Warner who blocked plaintiffs' vehicle at the intersection. This is inconsistent with plaintiffs' evidence that Deputy Hanley was the first to arrive at the intersection—which was also Deputy Warner's testimony—and their allegations the first deputy to arrive was the one who blocked their vehicle. Regardless, which deputy blocked plaintiffs' vehicle is immaterial for purposes of this appeal.

plaintiffs' vehicle. Deputy Hanley put up his hand as though to gesture to Matthew to remain stopped at the red arrow, while Deputy Warner's vehicle turned left onto Elizabeth Lake Road. Not more than four seconds after his arrival, and without making any further gestures towards Matthew, Deputy Hanley then turned left and proceeded after Deputy Warner westbound on Elizabeth Lake Road.

The status of the traffic arrow controlling the left turn lane when the deputies left is the subject of some controversy.

According to plaintiffs' opening brief, "[a]fter the traffic signal changed to green, [plaintiffs] remained at the intersection because [Deputy Hanley's vehicle] had not yet exited the intersection to follow [Deputy Warner's]. [Plaintiffs] waited for [Deputy Hanley's vehicle] to clear the entirety of the intersection and then without any further instructions not to go—and when police presence had completely disappeared from the [intersection]—proceeded on the green turn light with the intention of turning west onto Elizabeth Lake Road."

However, in the SAC, plaintiffs allege Deputy Hanley's vehicle blocked them while the left turn arrow was red. His vehicle then turned left and followed Deputy Warner's, "no longer ordering [Matthew] to remain stopped where he was. As such, with no further instruction, [plaintiffs'] car was unblocked, and its path was unobstructed. [¶] . . . Shortly thereafter, the left-hand traffic signal controlling [plaintiffs'] direction of travel turned green," and Matthew "began to initiate his left-hand turn by moving north-westbound." Similarly, Matthew admitted, in response to a request for admissions, that when the traffic arrow facing him turned green "there were no peace officers at the intersection."

5

To the extent of any conflict between the allegations of the SAC and plaintiffs' admissions, on the one hand, and those facts now proffered by plaintiffs, on the other, the former must control. (*Mark Tanner Constr. v. HUB Internat. Ins. Servs.* (2014) 224 Cal.App.4th 574, 586–587 [complaint's allegations binding on the plaintiff at summary judgment]; see also Code Civ. Proc., § 2033.410, subd. (a) ["Any matter admitted in response to a request for admission is conclusively established against the party making the admission in the pending action."].)

Soon after Deputies Hanley and Warner left the intersection heading west on Elizabeth Lake Road, Lerena sped toward and then passed them, heading east toward the intersection. The deputies performed U-turns to give chase. Immediately after they got their vehicles pointed eastbound, Lerena drove into the intersection against a red light at over 80 miles per hour.

At that moment, Matthew was negotiating his left turn onto Elizabeth Lake Road westbound on a green arrow. Lerena struck the driver's side of plaintiffs' vehicle with the stolen RAV4. The deputies and other law enforcement arrived at the intersection seconds later and began to render aid to plaintiffs and to take Lerena into custody.

Christine was pronounced dead at the hospital shortly after the wreck. Matthew and the boys all suffered injuries, ranging from a foot injury to a broken neck and torn aortic heart valve.

## II. Procedural History

Plaintiffs sued defendant in Los Angeles County superior court in 2019. Defendant removed the action to federal court based on plaintiffs' cause of action under section 1983 of title 42 of the United States Code. The federal court entered judgment

for defendant on that cause of action only and remanded the state law causes of action to the superior court.

As a result, just two causes of action of the SAC remained: negligence and wrongful death. Each rests on the same set of allegations. Plaintiffs divide these allegations into five sections. The first is entitled "General Allegations." (Underscoring, boldface & capitalization omitted.) It contains factual detail on the behavior of the LACSD deputies in the intersection shortly before the wreck, a description of the wreck itself, and plaintiffs' resulting injuries.

The second section is entitled "The Deputies Who Blocked Plaintiffs' Vehicle and Ordered Them to Stop Actively Controlled Plaintiffs and the Intersection and Were Not Part of the Pursuit Package." (Underscoring, boldface & capitalization omitted.) In this section, plaintiffs detail why the deputies' conduct in the intersection of ordering Matthew to stop is actionable. They assert that by blocking plaintiffs' vehicle and then leaving without further instruction, the deputies "*indicat*[*ed*] *it was safe* [*for Matthew*] *to resume driving, when it really was not.*" They allege the deputies' actions increased plaintiffs' risk of harm; they were "tantamount to ordering an individual to stand in the middle of the road in the path of the fleeing suspect."

The third section is entitled "Defendants Negligently Hired, Trained, Retained, and Supervised Their Deputies." (Underscoring, boldface & capitalization omitted.) Here, plaintiffs broadly allege defendant "negligently hired, trained, supervised, and retained [Deputies Hanley and Warner], . . . Unidentified Air Ship Personnel, the personnel involved in the pursuit, and other Unidentified Deputies and employees that contributed to the subject incident in any way. This includes all the individuals that

wrote and approved the policies at issue, promulgated the polices at issue, revised and edited and updated the policies at issue, and that provided the training on such policies."

The fourth section is entitled "Defendants were Grossly Negligent in the Pursuit Itself." (Underscoring, boldface & capitalization omitted.) In this section, plaintiffs allege defendant was responsible, but failed, to follow proper policies and industry standards "in initiat[ing], continu[ing], and conduct[ing] the pursuit. . . . The pursuit package was not properly authorized or maintained. [Deputies Hanley and Warner] were allowed to join the pursuit in a reckless and improper manner, without want of even scant care and/or in an extreme departure from the ordinary standard of care. The pursuit should never have been initiated, and[,] once initiated[,] should have been discontinued—but it was not." Further, defendant's "equipment, including . . . radios and other communication devices, sirens, and warning lights on air and land pursuit vehicles, . . . was defective, unsafe, and not properly maintained . . . and/or did not function properly."

The fifth, and final, section contains allegations addressed to defendant's claim of immunity. We need not detail those here as we do not reach the issue of immunity in disposing of this appeal.

Nowhere in the SAC do plaintiffs mention emergency dispatchers, a 911 call, a citizen's pursuit of Lerena, or defendant's acquiescence in, or knowledge or encouragement of, such a pursuit.

Defendant moved for summary judgment (or, in the alternative, summary adjudication) on several grounds. Among these were that it owed no duty to plaintiffs to protect them from Lerena. Its motion, like the SAC, centered on the conduct of

8

Deputies Hanley and Warner at the intersection where Lerena later crashed the stolen RAV4 into plaintiffs' vehicle.

Plaintiffs' opposition addressed defendant's arguments but also raised a new one: that the conduct of defendant's emergency dispatch staff—particularly in directing or otherwise acquiescing in a citizen pursuit by a 911 caller—was grossly negligent.

The trial court granted defendant's motion for summary judgment. It found defendant had no general duty to protect plaintiffs from, or warn them of, Lerena's conduct. It further found no such duty arose by Deputies Warner's and Hanley's conduct at the intersection prior to the wreck.

The trial court then turned to plaintiffs' arguments about the conduct of defendant's dispatch employees, and specifically the 911 operator's purported request to have a civilian follow Lerena. It found these arguments could not defeat summary judgment for two reasons. First, they were raised "for the first time in [plaintiffs'] opposition [to summary judgment]"; and second, there was no showing the conduct of the dispatchers caused plaintiffs' injuries.

Plaintiffs timely appealed.

## DISCUSSION

### I. Summary Judgment and Standard of Review

On a motion for summary judgment, a defendant must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) Summary judgment is appropriate only "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Id.*, subd. (c).) A triable issue of material fact exists if the evidence

9

and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' " (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.) It is no longer called a "disfavored" remedy. (*Ibid.*) "Summary judgment is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Ibid.*)

" 'We independently review an order granting summary judgment. [Citation.] We determine whether the court's ruling was correct, not its reasons or rationale. [Citation.] "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." [Citation.]' [Citation.] In performing our de novo review, we view the evidence in the light most favorable to . . . the party opposing summary judgment." (*Scheer v. Regents of University of California* (2022) 76 Cal.App.5th 904, 913.)

## II.     Limitation of Issues on Appeal

In their opening brief, plaintiffs contend "triable issues of material fact exist regarding [defendant's] dispatcher staff's gross negligence contributing to [plaintiffs'] injuries." (Boldface & capitalization omitted.) Their arguments concerning the conduct of the 911 dispatcher do not support reversal for several reasons.

First, plaintiffs fail in their opening brief to address the reasons the trial court rejected these arguments. They do not

explain how the SAC's allegations embraced the theory that the 911 operator negligently directed the citizen caller to follow, or acquiesced in him following, Lerena. Nor do they explain how the caller, who briefly got Lerena to stop driving and was not in sight of her at the time of the accident, caused plaintiffs' injuries. These failures preclude reversal based on plaintiffs' 911 operator theory. (Cf. *Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125–126 [where the appellant fails to present any argument on issue providing independent ground for summary judgment, appellate court may affirm summary judgment on this basis alone].)

Second, as discussed in footnote 2, *ante*, the actual evidence of what the 911 operator said to the caller is missing from the record on appeal. This is an independent reason plaintiffs' 911 operator theory cannot support reversal. (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348 ["By failing to provide an adequate record, appellant cannot meet his burden to show error and we must resolve any challenge to the order against him."].)

Third, even if such evidence had been submitted, we agree with the trial court that plaintiffs could not defeat summary judgment by raising factual issues pertaining to the conduct of defendant's 911 dispatchers. This is because the SAC was insufficient to put defendant on notice of this theory of liability.

In summary judgment proceedings, the pleadings define the issues. (*Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 444 (*Jacobs*).) " '[T]he scope of the issues to be properly addressed in [a] summary judgment motion' is generally 'limited to the claims framed by the pleadings. [Citation.] A moving party seeking summary judgment or

11

adjudication is not required to go beyond the allegations of the pleading, with respect to new theories that could have been pled, but for which no motion to amend or supplement the pleading was brought, prior to the hearing on the dispositive motion.' " (*Ibid.*, quoting *Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 421.)

As *Jacobs* illustrates, a plaintiff cannot defeat summary judgment on a cause of action for negligence pled on one set of facts by introducing evidence of negligence based on a different set of facts. In that case, the plaintiff was injured at a property listed for sale by the defendant realtors when the plaintiff climbed onto a diving board over an empty pool. (*Jacobs*, *supra*, 14 Cal.App.5th at p. 441.) The diving board broke and the plaintiff fell into the empty pool. (*Ibid.*) The complaint generally alleged the defendants " 'negligently, carelessly, recklessly, unlawfully and with gross negligence managed, owned, operated, leased possessed, secured, maintained and controlled said property, and were otherwise negligent and reckless and conducted themselves in a negligent manner, thereby directly and legally causing . . . injuries and damages to the Plaintiff . . . .' " (*Id.* at p. 442.) The plaintiff then elaborated, " 'Among other things, Defendants . . . failed to take measures to make the area where Plaintiff fell reasonably safe, repair the diving board and all accompanying attachments, protect Plaintiff from the diving board, remove the diving board, and failed to warn Plaintiff that the diving board and all accompanying attachments were in poor condition.' " (*Ibid.*)

The *Jacobs* defendants moved for summary judgment based on evidence they had exercised reasonable care with respect to the diving board, had no knowledge of the dangerous condition,

12

and had not caused the plaintiff's injuries. The plaintiff responded by asserting, for the first time in his opposition, that the empty swimming pool was the dangerous condition. (*Jacobs*, *supra*, 14 Cal.App.5th at p. 442.) The trial court refused to consider the empty pool theory because the plaintiff had not adequately alleged it. (*Id*. at p. 443.) The Court of Appeal affirmed. It explained, "a fair reading of the complaint's allegations does not suggest a negligence claim based on the condition of the empty pool as opposed to the condition of the diving board. A defendant (or a court) reading the complaint would not reasonably anticipate such a claim and, therefore, would not have understood that a motion for summary judgment would need to address the claim." (*Id*. at p. 444.) This was so notwithstanding "general allegations of negligence with respect to the failure to maintain and control the property" because the "complaint did not mention the pool" except to identify it as where the plaintiff fell after falling from the derelict diving board. (*Ibid*.)

The same analysis applies to plaintiffs' 911 operator theory in this case. Though they broadly alleged negligence in the SAC, their focus was on the conduct of Deputies Warner and Hanley and they made no mention whatsoever of the facts underpinning the 911 operator theory. Accordingly, it cannot serve as a basis for defeating summary judgment and is therefore not a basis for reversal.

## III. Defendant Is Not Liable for Failing to Protect Plaintiffs from Lerena

We turn next to the theory of liability as pled in the complaint. Public employers, like defendant, are immune from liability for tort claims except as provided by statute. (Gov. Code,

13

§ 815, subd. (a); see also *Searcy v. Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792, 798 ["all governmental tort liability is dependent upon the existence of an authorized statute"].)

Plaintiffs seek to impose liability on defendant in this case pursuant to Government Code section 815.2, subdivision (a), which makes a public entity "liable for injury proximately caused by [its] employee . . . within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee . . . ." (*Ibid.*) Under section 820, subdivision (a), public employees are generally "liable for injur[ies] caused by [their] act[s] or omission[s] to the same extent as . . . private person[s]."

Accordingly, the question presented here is whether Deputies Hanley or Warner owed a duty to protect plaintiffs from Lerena. Plaintiffs' sole theory giving rise to such a duty is that the deputy who blocked their vehicle,[4] knowing Lerena was speeding towards the intersection, should have maintained control of the intersection "rather than clear[ing] it and permit[ting] [plaintiffs] to enter to their detriment." Put another way, it is plaintiffs' position that Deputy Hanley undertook a duty to protect plaintiffs from the oncoming Lerena by briefly blocking plaintiffs' vehicle and gesturing to Matthew to remain stopped while Matthew was waiting at a red arrow. We cannot agree.

---

[4] As discussed in footnote 3, *ante*, plaintiffs refer to this person as Deputy Warner. We will refer to this person as Deputy Hanley based on the deputies' uncontroverted testimony and plaintiffs' allegations. As noted, which of defendant's deputies blocked plaintiffs' vehicle is immaterial to the resolution of this appeal.

" '[U]nder general negligence principles . . . a person ordinarily is obligated to exercise due care in his or her own actions so as . . . not to create an unreasonable risk of injury to others . . . . [Citations.] It is well established . . . that one's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct . . . of a third person.' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128 (*Zelig*), quoting *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716 (*Lugtu*).)

However, "public security officers, like other persons, generally may not be held liable . . . for failing to take affirmative steps to come to the aid of, or prevent an injury to, another person. 'As a rule, one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act.' [Citation.] More specifically, 'law enforcement officers, like other members of the public, generally do not have a legal duty to come to the aid of [another] person . . . .' " (*Zelig*, *supra*, 27 Cal.4th at pp. 1128–1129.)

"Liability may be imposed if an officer voluntarily assumes a duty to provide a particular level of protection, and then fails to do so [citations], or if an officer undertakes affirmative acts that increase the risk of harm to the plaintiff." (*Zelig*, *supra*, 27 Cal.4th at p. 1129.) But, " '[a]s a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.' [Citation.] A duty to control the conduct of another or to warn persons endangered by such conduct may arise . . . if ' "(a) a special relation exists between the

15

actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection." ' " (*Ibid.*)

"In most instances, these general rules bar recovery when plaintiffs, having suffered injury from third parties who were engaged in criminal activities, claim that their injuries could have been prevented by timely assistance from a law enforcement officer." (*Zelig, supra,* 27 Cal.4th at p. 1129.)

Despite acknowledging these rules, plaintiffs do little to explain how defendant could be liable for the injuries they sustained when Lerena drove the stolen RAV4 through a red light at over 80 miles per hour. They assert defendant "created a special relationship when [its deputies] maintained the intersection and that duty remained and was subsequently breached when they unreasonably failed to maintain control of the intersection and permitted [plaintiffs] to enter the [intersection] while there was an imminent oncoming threat—of which the [d]eputies were aware."

Plaintiffs cite no authority to support their assertion, and we are aware of none. First, knowledge of another's peril alone cannot establish a duty. (*Minch v. Department of California Highway Patrol* (2006) 140 Cal.App.4th 895, 903–904 (*Minch*).)

Second, plaintiffs fail to explain how deputies blocking plaintiffs' vehicle while it was stopped at a red arrow for less than five seconds created a special relationship between plaintiffs and defendant. Plaintiffs cite *Lugtu, supra,* 26 Cal.4th 703 and *McCorkle v. City of Los Angeles* (1969) 70 Cal.2d 252 for the proposition that police have a duty not to direct citizens into harm's way. In *Lugtu,* the plaintiffs were injured after a highway

patrol officer directed their vehicle to pull over and stop in the center median, where it was hit by another motorist. The Supreme Court in *Lugtu* recognized a duty on the part of officers to exercise reasonable care in performing a traffic stop, which includes the duty not to detain motorists in locations that subject them to unreasonable risks of injuries by third parties. (*Lugtu*, at pp. 716–717.) Similarly, *McCorkle* involved an injury sustained when a police officer investigating a traffic accident directed a citizen to follow him into an active intersection and the citizen was hit by a passing motorist. (*McCorkle*, at p. 259.) *McCorkle* illustrates the rule that "a duty of care . . . arise[s] when an officer engages in '*an affirmative act which places the person in peril or increases the risk of harm . . . .*' " (*Lugtu*, at p. 717.) In each case, the officers directed the plaintiffs to the locations where they suffered their injuries.

Here, defendant's deputies did not direct plaintiffs to the place where they were injured. The only control they exerted over plaintiffs was in directing Matthew to remain stopped when he was already obligated to do so while facing a red arrow. When the deputies left, plaintiffs' allegations are that they did so without further instruction, leaving plaintiffs' vehicle "unblocked, and its path . . . unobstructed." Free of any restraint, Matthew waited for the left turn arrow to turn green before proceeding into the intersection where the collision occurred.

Taking into account Matthew's admissions and the allegations of the SAC, there is no summary judgment evidence Matthew would have conducted himself differently but for the deputies' conduct. He stopped when the traffic light was red and proceeded when it was green. Plaintiffs assert the deputies should have protected them by preventing Matthew from driving

into the area where Lerena soon after hit plaintiffs' vehicle. Put differently, they assert defendant should have protected them from Lerena's criminal behavior. Plaintiffs' failure to articulate a basis for subjecting defendant to such a duty precludes liability for any alleged breach.

In so concluding, we draw some parallels to the circumstances in *Minch*, *supra*, 140 Cal.App.4th 895. There, two highway patrol officers undertook to protect a tow truck operator from passing traffic as he extracted a car from a ditch. After the car was fully extracted and hitched to the tow truck, one of the officers left. The tow truck driver knew this, and also knew the other officer was talking to the driver of the car to be towed. (*Id.* at p. 907.) Despite knowing the officers were no longer protecting him, the tow truck driver walked into a travel lane and was struck by a passing motorist. The *Minch* court held the officers owed the tow truck driver no duty in tort because "[t]hey did not create the risk of harm. After [he] extracted the [car], they did not direct him to stay at the scene or tell him where to park. . . . [He] was not in a position of dependency on the officers, and they did not say anything to indicate that they would guarantee his safety. [He] could not have detrimentally relied upon the officers' conduct when he [was hit]; at that time, he was fully aware that [one officer had left and the other was talking to the owner of the car]." (*Id.* at pp. 906–907.)

Similarly here, Deputy Hanley undertook to clear the intersection so he and Deputy Warner could drive through it against a red light. He did not undertake to protect plaintiffs from the oncoming Lerena and did not give plaintiffs any assurances about their safety. The deputies did not direct Matthew to drive into the intersection when the turn arrow

18

turned green. They did not create or change the risk plaintiffs faced. They owed plaintiffs no duty in tort to protect them from Lerena.

## DISPOSITION

The judgment is affirmed. Defendant is entitled to its costs on appeal.

RICHARDSON, J.

WE CONCUR:

CHAVEZ, Acting P. J.

SIGGINS, J.*

---

\* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19